IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 19, 2024

## STATE OF TENNESSEE v. DAMON CORDELL PARSON

**Appeal from the Criminal Court for Davidson County**
**No. 2016-D-1987      Cheryl Blackburn, Judge**

_____

### No. M2024-00266-CCA-R3-CD

_____

A Davidson County jury convicted the Defendant, Damon Cordell Parson, of three counts of selling .5 grams or more of cocaine, and the trial court sentenced him to a total effective sentence of twelve years, to be served consecutively to a previous sentence. On appeal, the Defendant contends that the trial court erred when it admitted audio recordings of the drug transactions and that, without the recordings, the evidence is insufficient to convict him. He further contends that the trial court erred when it sentenced him because it improperly sentenced him to the maximum sentence within his applicable sentencing range and did not make proper considerations with regard to alternative sentencing. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Damon Cordell Parson.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Mindy Jo Vinecore and Wilmoth Baker, IV, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Defendant's sale of cocaine to a confidential informant on three separate occasions in May 2016. In October 2016, the Davidson County grand jury indicted the Defendant for three counts of sale of .5 grams or more of cocaine and one

count of being a felon in possession of a firearm. In August 2017, the State filed its notice to seek enhanced punishment based on the Defendant's previous felony convictions.

## A. Trial

In January 2023,[1] the trial court held a bifurcated trial, trying the drug charges separately from the firearm charge.[2] The parties presented the following evidence: Detectives William Hampton, Detective Anthony Lopez, and Officer Joseph Snyder, all with the Metro-Nashville Police Department ("MNPD"), worked in a drug investigation unit and began an investigation of the Defendant, using a paid, female confidential informant ("CI"). Before any drug buys were attempted, Detective Hampton learned what vehicle the Defendant commonly drove. The CI purchased narcotics from the Defendant on three occasions: April 11, 2016, April 18, 2016, and May 2, 2016. On each of these occasions, officers followed pre-purchase and post-purchase protocol. All three purchases occurred in the same location, which was the Bordeaux branch of the Nashville Public Library and were supervised by Sergeant Marti Roberts, also with MNPD. During the sales, all the officers were in communication with each other via police radio and could hear the transactions transmitted live, and also recorded, by audio recording equipment outfitted to the CI.

On April 11, 2016, before the drug sale, Officer Snyder, who was tasked with "surveillance" of the sale, located the Defendant's four-door Infinity automobile. He notified the rest of the unit, including the two detectives, that he had located the vehicle. He parked nearby and watched the Defendant get into the vehicle and drive away. He advised the other officers that the Defendant had left his residence, and Sergeant Roberts, who was stationed at the library, informed the other officers shortly thereafter when the Defendant arrived at the location for the anticipated drug sale.

Simultaneously, the CI reported to the detectives and other officers and then texted the Defendant asking to purchase narcotics. Officers gave her $60 to complete the purchase of one gram of cocaine. Detective Lopez searched her vehicle, and the CI was also outfitted with a device that both transmitted and recorded the transaction, so that officers could hear the transaction as it occurred. Detective Hampton reviewed the recording of this sale, and the recording matched his memory of what he saw and heard that day. He identified the voices of the CI and the Defendant on the recording, and the State played the recording for the jury. On the recording, the voice of a woman, whom Detective Hampton identified as

---

[1]It appears that the extended duration between the drug sales and the trial occurred because the Defendant was on probation at the time of these drug sales. His probation was revoked, and he served the balance of that sentence before this trial.
[2]The jury acquitted the Defendant of the firearm charge.

the CI, is heard talking to a man, whom Detective Hampton identified as the Defendant, about getting called back into work. She then said, "thank you, buddy" and that she would "hit him up later."

Detective Hampton recalled that, after the CI left his presence, he heard her on the recording. Detective Lopez saw the Defendant's vehicle approach the drug sale area. Sergeant Roberts saw the CI briefly get into the Defendant's vehicle. The CI returned to the detectives with a white, powdery substance, which appeared to be cocaine, in a plastic baggie. He placed the evidence in an evidence bag with a tamper seal for future testing. He also searched the CI again and found no other evidence on her and found that that she no longer possessed the drug buy money that he had given her. The substance was later tested and determined to be 0.57 grams of cocaine.

The same procedure, in the same location, was followed on April 18, 2016. The CI contacted the Defendant using the same telephone number. On this occasion, officers used a video and audio recording device. The audio worked well, but there was little useful video from the encounter. Detective Hampton and Detective Lopez listened to the drug sale remotely and identified the voices of both the CI and the Defendant. Officer Snyder and Sergeant Roberts were positioned at the location of the drug sale for surveillance. They both saw the Defendant arrive on foot to the drug sale, enter the CI's vehicle, engage in a brief conversation, and then leave on foot returning in the direction of his residence. Both officers also listened to the transaction as it occurred via the CI's audio transmission.

After the transaction, the CI returned to the law enforcement officers and provided a white, powdery substance in a plastic baggie, which the detective placed in an evidence bag. The CI was again searched and found with no contraband and no drug buy money. The substance was later tested and determined to be 3.09 grams of cocaine.

In the audio recording of the transaction, the Defendant mentioned that his friend, a police officer, indicated that the Defendant's name was "coming up" in relation to illegal activity. He said that he might stop "hustling" and that the phone number being used by the CI might be cut off. The two talked for a little longer, and the informant mentioned that she needed to leave to get someone named "Ben."

The third and final drug sale occurred on May 2, 2016, in the same manner. Sergeant Roberts was positioned at the Defendant's residence before the sale. The sergeant saw the Defendant exit his residence and travel on foot towards the location of the drug sale. The sergeant and the Defendant made eye contact, and the sergeant relayed a description of the Defendant to the rest of the team.

3

Officers searched the CI's vehicle. The CI was outfitted with a transmitting and recording device, and was given $200 drug buy money. Detective Hampton had an officer in place to photograph this transaction. The CI contacted the Defendant using the new phone number the Defendant had given to her, and the two met again at the library. The detectives listened to the transaction remotely as it occurred and recognized the voices of the CI and the Defendant on the recording. Officer Snyder, also listening, was positioned at the location of the drug sale. He photographed the Defendant arriving at the scene of the sale and walking toward the CI's vehicle. He said the Defendant wore a brown jacket and black pants, and he identified a photograph that he took of the Defendant standing near the CI's car at the time of the transaction.

The CI, who was supposed to purchase three grams this time, returned with a white, powdery substance in a plastic baggie. Detective Hampton placed this in an evidence bag for further testing. The substance was later tested and determined to be 2.37 grams of cocaine.

In an audio recording of the transaction, the CI and the Defendant can be heard discussing the CI's dog. The two make small talk, and then the victim thanks the Defendant and leaves. The photograph taken by Officer Snyder of the transaction showed a man, who Officer Snyder had identified as the Defendant, in a brown hooded jacket and black pants standing next to the CI's vehicle.

Detective Hampton and other officers executed a search warrant for the Defendant's home on May 9, 2016. Officers found a Glock semi-automatic handgun in the bedroom and another semi-automatic weapon in the shed. At that time, Detective Hampton interviewed the Defendant, who admitted that he sold drugs but did not keep them at his home, where he lived with his mother. The Defendant would not disclose where he kept the drugs that he sold.

The detective found two cell phones on the Defendant, one of which was assigned the same number that the CI used to arrange the third drug transaction. The detective placed a call from his phone to that number, and the Defendant's phone rang, leading the detective to believe the phone was in working order.

During cross-examination, Detective Hampton agreed that the CI was paid between $40 and $60 for her participation in the drug transactions. It was possible that the CI worked on other cases and was compensated accordingly. He further agreed that officers did not find other evidence of drug sales in the Defendant's home and that there were multiple other people present in the home, including the Defendant's brother, uncle, and mother.

Based upon this evidence, the jury convicted the Defendant of three counts of selling .5 grams or more of cocaine.

## B. Sentencing Hearing

At the Defendant's sentencing hearing, held March 22, 2023, the trial court reminded the parties that the Defendant had been convicted of three counts of the sale of .5 grams or more of cocaine and that each of those offenses was a Class B felony. According to the Defendant's prior record, he had multiple prior Class B and Class E felony convictions, which would qualify him as a Range II Offender. The court said, however, that because the State's notice of enhancement did not include all the felonies, the trial court considered the Defendant a Range I Offender. The Defendant's applicable sentencing range, therefore, was eight to twelve years for each offense. The parties further noted that the Defendant was on probation at the time that these drug sales occurred. His probation was revoked, and he was incarcerated and served the remaining time on that sentence before his trial in this case.

The Defendant's brother, Justin Owen Parson, testified that the Defendant returned to Nashville after release from incarceration and made bond on these charges. The Defendant moved into a residence with their mother and the Defendant's twelve-year-old son and his other, older son, both of whom he had custody. The Defendant, who was being tracked via GPS monitoring, worked every day. He also spent time with his sons each day and on the weekends. Mr. Parson said that, in 2016, the Defendant had an issue with drugs, but he no longer had any drug issue since being released from custody.

The Defendant said that he was incarcerated from 2016 to 2023 and that, during that time, he reflected on his choices. He took responsibility for his drug habit and worked to improve himself through various programs, classes, and substance abuse counseling. The Defendant said he had made efforts to reconnect with his family and repair his relationships, and he was committed to continue making positive changes in his life. He reminded the trial court that he had been successful while on bond and complied with his requirements. While incarcerated awaiting this trial, he joined a barber program through the jail to continue to improve himself.

The trial court considered the presentence report, the statistical information, and the punishment deserved in relation to the seriousness of the offenses. The trial court found that the following enhancement factors applied: (1) that the Defendant had a history of criminal convictions in addition to those necessary to establish his range, noting that had the State accurately filed the notice the Defendant would have been a Range II and not a Range I Offender; (8) that the Defendant has previously failed to comply with conditions of release, as he was on probation at the time he committed the offenses in this case; (13)

5

that he was released on probation at the time he committed the offenses in this case. T.C.A. § 40-35-114 (1), (8) and (13). The trial court found no mitigating factors applied.

The trial court sentenced the Defendant to twelve years for each of the convictions. The trial court found that, as the Defendant's sentence was twelve years, he was not eligible for an alternative sentence. The trial court ordered the Defendant to serve the sentences concurrently with each other but consecutively to a sentence from a previous conviction.

It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it admitted audio recordings of the drug transactions and that, without the recordings, the evidence is insufficient to convict him. He further contends that the trial court erred when it sentenced him because it improperly sentenced him to the maximum sentence within his Range I Offender sentencing range and did not make proper considerations with regard to alternative sentencing.

## A. Recordings

The Defendant contends that the trial court improperly admitted the audio recordings of the three drug transactions because there was not an adequate foundation laid by the State for their admission. The Defendant asserts that there was no proof of what happened in the vehicle other than the CI's account, and she did not appear for trial. Therefore, this evidence should not have been admitted. Because she did not appear, the recordings contained inadmissible hearsay. The State asserts first that the Defendant has waived this issue because during trial he objected to the recordings on the basis of a confrontation clause violation and, on appeal, he has objected based on improper foundation. It further contends that this issue is without merit. We conclude that Defendant preserved the issue but agree with the State that the recordings were properly admitted.

As recited in *State v. Harbison*, 539 S.W.3d 149 (Tenn. 2018), and pursuant to Tennessee Rule of Appellate Procedure 36(a), a court need not grant relief to a party "who fail[s] to take whatever action [is] reasonably available to prevent or nullify the harmful effect of an error." *Id.* at 165. Appellate briefs must contain a statement of the issues presented for review and an argument setting forth the appellant's contentions, reasons for appellate relief with citations to authorities and the record, and the applicable standard of review. Tenn. R. App. P. 27. Appellate review is generally limited to issues presented for review. *See* Tenn. R. App. P. 13(b); *State v. Bishop*, 431 S.W.3d 22, 43 (Tenn. 2014) (citing *Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012)). An appellate court may

decline to consider issues that a party failed to raise properly. *Harbison*, at 165 (citing, inter alia, *Bishop*, 431 S.W.3d at 43). Tennessee Rule of Appellate Procedure 13, however, allows the appellate court the discretion to consider other issues "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Tenn. R. App. P. 13(b). When taken together, Rules 13(b) and 36(a) authorize appellate courts to give "complete relief to the parties as long as they have been given fair notice and an opportunity to be heard on the dispositive issues." *Harbison*, 539 S.W.3d. at 165 (citations omitted).

In deciding whether a party has waived an issue on appeal, we do not exalt form over substance but instead review the record carefully to determine whether a party is raising an issue for the first time on appeal. Id., at 165 (citing *Fayne v. Vincent*, 301 S.W.3d 162, 171 n.6 (Tenn. 2009)). A party does not waive an issue by phrasing it differently in the trial court than on appeal. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 143 n.1 (Tenn. 2001) (noting that "the failure to use the right label does not result in a waiver"). The Defendant raised the issue of the admissibility of the audio tapes in the lower court, but the State correctly notes that he did so on other grounds. The record does show some discussion, however, of whether the tapes had been properly authenticated, and the trial court allowed more testimony and then ultimately ruled that a proper foundation had been laid. We will, therefore, review this issue on its merits.

The admissibility of evidence rests within the sound discretion of the trial court, and this court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.*

As a prerequisite to admissibility, a witness with knowledge of the facts must verify and authenticate the evidence, and its relevance must be demonstrated. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see* Tenn. R. Evid. 401, 901(a), (b)(1). The authentication requirement "is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The party offering the evidence is required to "reasonably establish the identity and integrity of the evidence"; however, "this rule does not require that the identity . . . be proven beyond the possibility of all doubt[.]" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)).

Here, the detectives fitted the CI with the audio recording equipment and connected the feed to their monitoring devices so that they could listen to, as well as record, the drug transaction while it was occurring. Officers observed the Defendant leave his known residence and arrive at the predetermined location for the drug sale. On one occasion,

7

officers observed the CI enter into the Defendant's known vehicle and on the other two occasions, officers observed the Defendant get into the CI's vehicle. All the officers then heard the CI and the Defendant communicate through the audio recording. The Defendant left the scene of the sale at the conclusion of the interactions.

Accordingly, Detective Hampton had knowledge that the audio recording was what it was purported to be, a recording of the interaction between the CI and the Defendant during a drug sale. The trial court did not abuse its discretion when it found that Detective Hampton was able to authenticate the recording of the transaction. The officers saw the Defendant arrive to meet with the CI and observed of the CI and the Defendant together during the live transmission of the sale, which was also recorded. Detective Hampton said that he was familiar with the CI's voice and became familiar with the Defendant's voice, and he recognized their voices on the recording, which were played for the jury. He also heard the interactions on the audio recording in real time. Based on the foregoing reasons, we conclude that the trial court did not abuse its discretion when it allowed Detective Hampton to authenticate this recording. The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of Evidence

The Defendant contends that, without the audio recordings that he claims were inadmissible, the evidence is insufficient to sustain his convictions. While we have determined that the audio recordings were not improperly allowed, we will still turn to address the sufficiency of the evidence supporting his convictions. The State responds that the evidence is sufficient to sustain his convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)), *abrogated on other*

*grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523, 527 (1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was convicted of three counts of selling of .5 grams or more of cocaine, and the State was required to prove beyond a reasonable doubt that the Defendant knowingly "sold a controlled substance." T.C.A. § 39-17-417(a)(3). A violation of Tennessee Code Annotated section 39-17-417(a)(3) is a Class B felony if the amount of the cocaine sold is .5 grams or more. T.C.A. § 39-17-417(c)(1). Thus, to convict the Defendant, the State was required to prove beyond a reasonable doubt: (1) a knowing

mental state; (2) the sale of cocaine; (3) that the weight of the cocaine was .5 grams or more. T.C.A. § 39-17-417(a), (c).

For each of the three drug purchases in this case, the evidence viewed in the light most favorable to the State proved that the CI contacted the Defendant and asked to purchase cocaine, and the two agreed to a sale location. Multiple officers monitored the sale, with some officers stationed outside the Defendant's home, watching as he left to go to the appointed drug sale location at the agreed time. Detectives searched the CI before the sale, watched as she texted the Defendant to set up the sale, and gave her money with which to purchase the narcotics. The detectives fitted the CI with recording equipment so that they could remotely hear the transaction as it was occurring and also record it.

Other officers stationed at the appointed meeting area saw the Defendant arrive. For one sale, they observed the CI get into his vehicle and for the other two they watched as the Defendant got into the CI's vehicle. Officers identified both the Defendant and the CI. Other officers identified the voices of the CI and the Defendant on the audio recording, which they listened to live. The CI left the sale location, traveled immediately back to the officers, and was again searched. On each of the three occasions she was found in possession of a powdery, white substance in a baggie that appeared to be cocaine, and she was no longer in possession of the drug buy money. The substances in the baggies were later tested and proved to be .57, 2.37, and 3.09 grams of cocaine respectively.

When officers executed the search warrant, the Defendant admitted that he sold drugs. He was also in possession of two phones, one of which was assigned the same number that the CI had used to arrange the third drug buy.

This evidence is sufficient to support the Defendant's convictions for three counts of the sale of .5 grams or more of cocaine. The Defendant is not entitled to relief on this issue.

### C. Sentencing

The Defendant contends that the trial court erred when it sentenced him because it improperly sentenced him to the maximum sentence within his range and because it did not consider the purposes of alternative sentencing. The State counters that the record supports the trial court's sentencing determination. We agree with the State.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a presumption of reasonableness." *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual

circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

The Defendant cites to *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992) for the proposition that we should review the trial court's findings de novo because it inappropriately applied an enhancement factor and failed to apply mitigating factors. Importantly, this is no longer the law. The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

The record evinces that the trial court appropriately considered the enumerated considerations. As noted by the trial court, the Defendant qualified as a Range II Offender but, because of a deficiency in the notice requirement, was being sentenced as a Range I Offender. The trial court found several enhancement factors applied and that no mitigating factors applied. The trial court noted the Defendant's previous convictions included two Class E felony weapons convictions, two Class E felony drug convictions, and two Class

11

B felony drug convictions. It further noted that the Defendant was on release in the community, for a Class B felony drug conviction, when he committed the three drug sales in this case. The court therefore ordered the Defendant to the maximum sentence within his range but also ordered concurrent service of all three sentences. We conclude that the trial court did not abuse its discretion when it determined the length of the Defendant's sentence.

We now turn to address whether the trial court considered the purposes of sentencing with regard to alternative sentencing. Our supreme court has stated that "the abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions." *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)). This includes questions related to probation or any alternative sentence. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying standard to probation and alternative sentence).

Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a). The Defendant in this case received an effective sentence of twelve years, and therefore, was not eligible for probation. *See* T.C.A. § 40-35-303(a). As we previously stated, the trial court made appropriate considerations when sentencing the Defendant and did not err when it determined the length of the Defendant's sentence. Accordingly, the trial court did not err when it determined that the Defendant was not eligible for an alternative sentence.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE